# EXHIBIT L

Proctor v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RONALD PROCTOR,                    )
                                   )
              Plaintiff,           )
                                   )
v.                                 )  Civil Action
                                   )  Number 05-133-JJF
STANLEY TAYLOR,                    )
THOMAS CARROLL,                    )
DAVID PIERCE,                      )  JURY TRIAL DEMANDED
THOMAS SEACORD,                    )
FRANCIS KROMKA, and                )
BRIAN ENGREM,                      )
                                   )
              Defendants.          )

              Deposition of RONALD PROCTOR, taken
pursuant to notice at Delaware Correctional Center,
1181 Paddock Road, Smyrna, Delaware, beginning at
10:06 a.m., on Tuesday, February 6, 2007, before Julie
H. Parrack, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public.

APPEARANCES:

         STACEY XARHOULAKOS
         DEPUTY ATTORNEY GENERAL
         STATE OF DELAWARE DEPARTMENT OF JUSTICE
           820 North French Street, 6th Floor
           Wilmington, Delaware  19801
           On behalf of Defendants

              WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

              www.wilfet.com

Proctor v. Taylor, et al.
Ronald Proctor

| | |
|---|---|
| **Page 2** | **Page 4** |

**Page 2**

1  BY MS. XARHOULAKOS:
2     Q.  Mr. Proctor, my name is Stacey Xarhoulakos.
3  We've corresponded before. I'm representing the
4  defendants in this action that you filed. Now, are
5  you aware of which case we're here on?
6     **A.  Yeah, I need to see a copy of the complaint,**
7  **since --**
8     Q.  You'd like to see a copy of the complaint?
9     **A.  Yeah.**
10     Q.  I brought one and I'm actually going to use it
11  so I'm going to admit as an exhibit, okay? But
12  I'll give you a copy also.
13         (Proctor Exhibit No. 1 was marked for
14  identification.)
15     Q.  Okay, so in this action, Mr. Proctor, you've
16  named Lt. Seacord, Sgt. Doe, Capt. Segars, Deputy
17  Warden Pierce --
18     **A.  Sgt. Doe has been identified.**
19     Q.  Okay, just reading the names off the complaint
20  for you, okay? Commissioner Taylor and Brian Engrem
21  and Corporal Kromka. And these are the persons that
22  I'm representing. Do you understand that?
23     **A.  Yes.**
24     Q.  Okay. Have you ever had your deposition taken

**Page 3**

1  before?
2     **A.  Are these your notes or copies?**
3     Q.  That's my note. Here you go, sorry about that.
4     **A.  Have I ever been what?**
5     Q.  Deposed before.
6     **A.  No.**
7     Q.  Do you understand what a deposition is?
8     **A.  Yes.**
9     Q.  I'm going to ask you questions today, just from
10  your memory and about the case. And it's being taken
11  down by the court reporter. She did swear you in, so
12  it is sworn testimony meaning that it's under oath and
13  you're subject to the laws of perjury, so you have to
14  tell the truth.
15         Because she's transcribing what we are
16  discussing today, you need to make sure you speak all
17  your answers. If you shake your head yes or no, I'll
18  just ask you to speak your answer so that it can be
19  transcribed by the court reporter. And if you don't
20  understand what I'm asking you, I need you to ask me
21  to clarify the question or repeat the question or
22  restate the question and I will do so. Will you agree
23  to do that?
24     **A.  Yes.**

**Page 4**

1     Q.  Okay. If you need a break at any time, let me
2  know. There's another thing I want to cover with you,
3  which is the reading and signing. The deposition
4  that's being taken today, you are entitled to a copy
5  of it, but you have to purchase it yourself. However,
6  you are also allowed to read and sign it, which means
7  you can review a copy of the deposition and check for
8  any errors in spelling or corrections in words. It
9  doesn't mean you can change your testimony, but if
10  something was misheard, you can correct it. You can't
11  rewrite what was said. And then you'll be able to
12  sign the deposition.
13         Now, that's an opportunity you can have or
14  you can waive that. So I'd like to know if you would
15  like to do the reading and signing.
16     **A.  Yes.**
17     Q.  Okay. Now, Mr. Proctor, are you on any
18  medications right now?
19     **A.  Yes.**
20     Q.  And what are they?
21     **A.  Sinequan and Risperdal.**
22     Q.  And what are they for?
23     **A.  Antianxiety medication.**
24     Q.  Any others?

**Page 5**

1     **A.  No.**
2     Q.  And when did you last take them?
3     **A.  Last night, 6:00.**
4     Q.  Are these daily medications?
5     **A.  Yes.**
6     Q.  Just once a day?
7     **A.  Yes.**
8     Q.  So your next pill will be tonight at 6:00?
9     **A.  Yes.**
10     Q.  Do you think that these medications are in any
11  way going to cloud your judgment or prevent you from
12  telling the truth today?
13     **A.  No.**
14     Q.  Mr. Proctor, have you ever filed another
15  lawsuit besides this one?
16     **A.  Yes.**
17     Q.  Do you know approximately how many?
18     **A.  Eight to 10.**
19     Q.  And in what courts?
20     **A.  District Court.**
21     Q.  Have they all been in federal court?
22     **A.  No, some in state court proceedings.**
23     Q.  And in what courts in state court have you
24  filed suits?

Wilcox and Fetzer, Ltd.   Registered Professional Reporters   302-655-0477

Proctor v. Taylor, et al.
Ronald Proctor

---

Page 6

1    A.  **JP Court, Superior Court.**
2    Q.  Any other locations where you filed suits?
3    A.  **No.**
4    Q.  Any other states other than Delaware?
5    A.  **Yes.**
6    Q.  What other states?
7    A.  **Florida.**
8    Q.  Any others?
9    A.  **No.**
10   Q.  Do you have any other lawsuits pending right
11   now other than this one?
12   A.  **No.**
13   Q.  And have any of your lawsuits gone to trial?
14   A.  **Yes.**
15   Q.  In what courts?
16   A.  **JP.**
17   Q.  Any other than JP Court?
18   A.  **District Court, Florida, Northern district.**
19   Q.  Mr. Proctor, I'm just going to have to ask you
20   to hand the complaint back to me at this moment, but
21   I'll give it back to you when I ask you about it, just
22   so I can have your focus.
23        Tell me a little bit about your
24   background.  Where were you born?

---

Page 7

1    A.  **Springfield, Illinois.**
2    Q.  And when was that?
3    A.  **9-5-58.**
4    Q.  And how long did you live in Illinois?
5    A.  **Two years.**
6    Q.  And then where did you move to?
7    A.  **Delaware.**
8    Q.  And have you been in Delaware ever since?
9    A.  **Yes.**
10   Q.  Were you at some point in Florida?
11   A.  **For a few years, but not live -- residing**
12   **there.**
13   Q.  Well, what were you doing there?
14   A.  **Absconding.**
15   Q.  Can you explain?
16   A.  **Absconding.  Absconding from one state to the**
17   **next.**
18   Q.  What were you doing when you were in Florida?
19   A.  **What do you mean, work?**
20   Q.  Were you incarcerated, were you working, what
21   were you doing?
22   A.  **No, I was going to law school, University of**
23   **Miami.**
24   Q.  So you went to law school in Florida at the

---

Page 8

1    University of Miami?
2    A.  **Yes.**
3    Q.  For how long?
4    A.  **Two years, '84 to '86.**
5    Q.  And did you get your undergraduate degree in
6    Florida?
7    A.  **No, because when it came time to take the state**
8    **test for the Bar Association, they discovered that I**
9    **had a 1976 arrest that barred me from taking the Bar**
10   **exam in Florida.**
11   Q.  Mr. Proctor, I just want to clarify something
12   just so it's easier for the court reporter.  It would
13   be helpful if you would just let me finish my
14   questions before you answer them, because if both of
15   us are talking at the same time, she's not going to be
16   able to take down what we're saying.  Okay?  Would you
17   agree to do that?
18   A.  **Yes.**
19   Q.  Okay.  Now, I just want to step back.  You said
20   you went to law school at University of Miami.  Did
21   you go to get an undergraduate degree in Florida?
22   A.  **Yes.**
23   Q.  And what school?
24   A.  **In University of Miami.  My undergraduate was**

---

Page 9

1    from a Blackstone mail-in course.
2    Q.  So you got a mail-in undergraduate degree; is
3    that right?
4    A.  **Yeah, from Blackstone.**
5    Q.  And what was it in?  What was your degree for?
6    A.  **It was political science.**
7    Q.  Anything else?
8    A.  **No.**
9    Q.  Other than '84 to '86, was there any other time
10   period where you were in Florida?
11   A.  **'97 to 2000.**
12   Q.  And what were you doing in Florida at that
13   time?
14   A.  **Incarcerated.**
15   Q.  And what were you incarcerated for?
16   A.  **Absconding.**
17   Q.  And when you were in Florida, were you ever
18   living in a house, not in a prison, were you ever
19   living in an apartment?
20   A.  **No.**
21   Q.  Where did you live when you went to the
22   University of Miami?
23   A.  **I worked for an attorney who paid my tuition to**
24   **go to law school.**

---

3  (Pages 6 to 9)

Proctor v. Taylor, et al.
Ronald Proctor

| Page 10 |
|---|
| 1    Q. My question was where did you live? |
| 2    **A. Lived in a condo.** |
| 3    Q. So you have lived at other locations in |
| 4   Florida; is that right? |
| 5    **A. Just one location in North Miami Beach.** |
| 6    Q. What was the address of the condo? |
| 7    **A. 19620 North East 26th Avenue, North --** |
| 8    Q. How did you pay for it? |
| 9    **A. It wasn't, it was part of the job.** |
| 10   Q. So you worked for an attorney who paid for your |
| 11   condo and paid for your tuition to law school? |
| 12    **A. Right.** |
| 13   Q. And what was this attorney's name? |
| 14    **A. Wayne C. Buri.** |
| 15   Q. Can you spell the last name? |
| 16    **A. B-u-r-i.** |
| 17   Q. Is he still an attorney in Florida? |
| 18    **A. His last name now is Summers, S-u-m-m-e-r-s.** |
| 19   Q. Is it Buri or Summers? |
| 20    **A. His last name now is Summers, S-u-m-m-e-r-s.** |
| 21   Q. Did he change his name? |
| 22    **A. Yes.** |
| 23   Q. Do you know why? |
| 24    **A. Religion, I think.** |

| Page 11 |
|---|
| 1    Q. Is Mr. Summers still an attorney in Florida? |
| 2    **A. Yes, he is.** |
| 3    Q. Do you know how he can be contacted? |
| 4    **A. No, I don't.** |
| 5    Q. Have you been in touch with him since you left |
| 6   Florida? |
| 7    **A. I call him every now and then.** |
| 8    Q. Do you have his phone number? |
| 9    **A. No, not on me.** |
| 10   Q. Well, do you have it somewhere in your cell? |
| 11    **A. No, at home.** |
| 12   Q. Do you ever call him from prison? |
| 13    **A. No.** |
| 14   Q. Were you ever married, Mr. Proctor? |
| 15    **A. No.** |
| 16   Q. Have you ever had a long-time serious |
| 17   girlfriend? |
| 18    **A. Yes and no. Four years, six years at the most.** |
| 19   Q. Were these two separate occasions? |
| 20    **A. Yes.** |
| 21   Q. One was four years? |
| 22    **A. The other one was six years.** |
| 23   Q. And when were these relationships? |
| 24    **A. Early '80s, early '90s.** |

| Page 12 |
|---|
| 1    Q. One was in the early '80s and one was in the |
| 2   early '90s? |
| 3    **A. '79 to '82. '91 to '95.** |
| 4    Q. And what happened to those relationships? |
| 5    **A. Broke them off.** |
| 6    Q. Who broke them off? |
| 7    **A. Just, we just separated, that's all. We** |
| 8   **weren't married, just separation.** |
| 9    Q. Did you break off the relationship or did the |
| 10   girlfriend? |
| 11    **A. Can't remember.** |
| 12   Q. While not incarcerated, have you ever held down |
| 13   a job? |
| 14    **A. Yes.** |
| 15   Q. What type of job? |
| 16    **A. Opened my own business, Coastal Glass in Dover,** |
| 17   **Delaware.** |
| 18   Q. Coastal Glass? |
| 19    **A. Yes.** |
| 20   Q. And when did you have this business? |
| 21    **A. '79 to '83.** |
| 22   Q. And what type of glass was the business in? |
| 23    **A. Commercial, residential.** |
| 24   Q. Would you say it was successful? |

| Page 13 |
|---|
| 1    **A. It's still open today. It's called Bennett's** |
| 2   **Action Glass.** |
| 3    Q. It's called what, can you repeat? |
| 4    **A. Bennett's Action Glass.** |
| 5    Q. And who owns it now? |
| 6    **A. Well, my father did till he passed away in** |
| 7   **March. Now Mr. Go Glass owns it now, they purchased** |
| 8   **it in April of 2006.** |
| 9    Q. So when you worked there, was it your father's |
| 10   business or was it your business? |
| 11    **A. My father's. Father owned 51 percent.** |
| 12   Q. And how many years did you say you worked |
| 13   there? |
| 14    **A. Well, off and on since early '70s, but the time** |
| 15   **that I had it personally was from '79 to '82, '83.** |
| 16   Q. And how would you describe the work that you |
| 17   did there? |
| 18    **A. It's just glass, glazier work, commercial,** |
| 19   **residential.** |
| 20   Q. Did you install the glass? What did you do? |
| 21    **A. Commercial, residential, all aspects of glass** |
| 22   **installation and replacements, contracts, residential.** |
| 23   Q. Okay, let me clarify a little bit, Mr. Proctor. |
| 24   I guess I'm just asking not so much what the business |

4 (Pages 10 to 13)

Proctor v. Taylor, et al.
Ronald Proctor

|  | Page 14 |
|---|---|
| 1 | does, but what your job was while you were working |
| 2 | there? |
| 3 | A. I was owner/operator. |
| 4 | Q. Did you manage the daily business? |
| 5 | A. Yes. |
| 6 | Q. What types of things did that entail? |
| 7 | A. Work orders, dealing with clients, doing |
| 8 | takeoffs, going out to job sites. |
| 9 | Q. Other than working with this business, have you |
| 10 | ever held any other jobs? |
| 11 | A. No. |
| 12 | Q. I'd like to talk a little bit about where |
| 13 | you're housed now. Tell me where you're housed now. |
| 14 | A. Where, what do you mean housed, here? |
| 15 | Q. Your housing location at DCC. |
| 16 | A. Here? |
| 17 | Q. Yes. |
| 18 | A. SHU, Security Housing Unit. |
| 19 | Q. And tell me about SHU. |
| 20 | A. Well, it's 23 hours, 24 hours a day, seven days |
| 21 | a week. And I still ain't figured out why I'm here. |
| 22 | And the counselor doesn't even know why I'm here. In |
| 23 | his note he even tells me he doesn't know why I'm |
| 24 | here. But he says he's going to explain to me why I |

|  | Page 15 |
|---|---|
| 1 | am in the SHU. I asked him, I said, "Why would a |
| 2 | person on violation of probation be in the SHU?" |
| 3 | Q. How long have you been in SHU on this |
| 4 | particular time? |
| 5 | A. Since the 9th of January. |
| 6 | Q. And before that where were you? |
| 7 | A. I was on — well, on the street at home. |
| 8 | Q. And how long were you home for? |
| 9 | A. Eight days. |
| 10 | Q. Did you have a home to go to? |
| 11 | A. Yes. |
| 12 | Q. Where is that? |
| 13 | A. 255 East Harriet Street. |
| 14 | Q. And what's the city? |
| 15 | A. Dover, Delaware. |
| 16 | Q. Whose home is it? |
| 17 | A. That's my mother's and our rental unit, which I |
| 18 | use when I'm home, but when I'm not home, it's used as |
| 19 | a rental unit. |
| 20 | Q. Is your mother still living there? |
| 21 | A. Yes. |
| 22 | Q. So it's her home and then an attached rental |
| 23 | unit, is that right? |
| 24 | A. Separate, yes. |

|  | Page 16 |
|---|---|
| 1 | Q. Other than your mother, what other relatives do |
| 2 | you have? |
| 3 | A. Two sisters. |
| 4 | Q. And where are they? |
| 5 | A. Same, Dover, Delaware. |
| 6 | Q. Are they married? |
| 7 | A. Yes. |
| 8 | Q. And do you have nieces and nephews? |
| 9 | A. Yes. |
| 10 | Q. How many? |
| 11 | A. Four nieces and two nephews. |
| 12 | Q. Do they also live in Dover? |
| 13 | A. Yes. |
| 14 | Q. What is your relationship like with them? |
| 15 | A. It's fine. |
| 16 | Q. Do you get to talk to them? |
| 17 | A. Whenever I call, yeah. |
| 18 | Q. So you do speak with all of them? |
| 19 | A. Yes. |
| 20 | Q. Tell me about your day while you're in SHU. |
| 21 | A. It's 24 hours a day, locked up in a cell, |
| 22 | that's it. For no reason at all. None given. |
| 23 | Q. Okay, imagine I know nothing about the |
| 24 | institution, I know nothing about SHU. Tell me how |

|  | Page 17 |
|---|---|
| 1 | the cells are laid out. |
| 2 | A. It's a 6-by-11 cell with a bed and a bunk. |
| 3 | That's it, toilet and everything, it's self-contained. |
| 4 | Q. Are they all in a row? |
| 5 | A. They're housing, they're cells. One person to |
| 6 | a cell. |
| 7 | Q. And is there more than one tier? Is there only |
| 8 | one tier? |
| 9 | A. There's three tiers in a unit. |
| 10 | Q. And what tier are you on right now? |
| 11 | A. 19D, upper floor. |
| 12 | Q. And do you have to wake up at a certain time? |
| 13 | A. No. |
| 14 | Q. They let you wake up whenever you want? |
| 15 | A. Whenever. |
| 16 | Q. What about meals, how do you get your meals? |
| 17 | A. They're brought to you. |
| 18 | Q. Who brings them to you? |
| 19 | A. The guards. |
| 20 | Q. And then do you eat in your cell? |
| 21 | A. Yes. |
| 22 | Q. How many meals do you get in a day? |
| 23 | A. Three. |
| 24 | Q. What times are your meals brought to you? |

5 (Pages 14 to 17)

Proctor v. Taylor, et al.
Ronald Proctor

|     | Page 18 |     | Page 20 |
|-----|---------|-----|---------|
| 1 | A. 5 a.m., 11 a.m. and 5, 5 p.m. | 1 | you were working as a paralegal or is this another |
| 2 | Q. And you said you're housed in your cell alone? | 2 | time? |
| 3 | A. Yes. | 3 | A. This is all pro bono work. |
| 4 | Q. Is that the same for everyone who's in SHU? | 4 | Q. Is this work you're doing while you're here or |
| 5 | A. Yes. | 5 | while you're out? |
| 6 | Q. Do you ever get to get out of your cell during | 6 | A. No, I don't do any while I'm here, unless it's |
| 7 | the course of a day? | 7 | structured, either through another legal organization |
| 8 | A. Three days -- three times a week. This morning | 8 | or otherwise. |
| 9 | I would have went out if I hadn't come here, and | 9 | Q. I'm sorry, what does that mean? Can you |
| 10 | that's for rec for an hour. Then you get a shower and | 10 | explain that to me? |
| 11 | you're back in your cell. | 11 | A. You offer your services to other inmates |
| 12 | Q. And where is rec? | 12 | through other legal entities. |
| 13 | A. In a cage. | 13 | Q. And what legal entities have you used? |
| 14 | Q. Are you with anyone else during rec? | 14 | A. Southern Legal Poverty, Florida Legal |
| 15 | A. No. | 15 | Perspectives, Prison Legal News, Washington State. |
| 16 | Q. What do you do while you're there? | 16 | That's all. |
| 17 | A. You do whatever you're going to do; walk | 17 | Q. Is this ongoing? Is this work that you do all |
| 18 | around, exercise, or talk to the next person over | 18 | the time? |
| 19 | there to you or, in a cell in front of you, whatever. | 19 | A. Some that you volunteer, either assist other |
| 20 | Q. So you're in your own individual cell for rec? | 20 | inmates in preparation of legal documents or pending |
| 21 | A. Yes. | 21 | actions. |
| 22 | Q. And how long are you there for? | 22 | Q. Are you allowed to do this while you're at DCC? |
| 23 | A. Forty-five minutes. | 23 | A. Allowed? There is no issue of allowance to do |
| 24 | Q. I'm going to talk a little bit about your | 24 | pro bono work for other legal entities as long as it |

|     | Page 19 |     | Page 21 |
|-----|---------|-----|---------|
| 1 | history at DCC or in Delaware prisons. How much of | 1 | doesn't contain itself within the institution of other |
| 2 | your adult life have you been incarcerated? | 2 | inmates incarcerated with you, and that there's no |
| 3 | A. Out of the last 48 years, eight to 11 years. | 3 | remuneration for any assistance offered. |
| 4 | Q. Eight to 11 of the last 48? | 4 | Q. Have you assisted any other inmates at DCC with |
| 5 | A. Right. | 5 | their lawsuits? |
| 6 | Q. And has most of that time been spent in | 6 | A. Numerous. |
| 7 | Delaware prisons? | 7 | Q. Can you name them? |
| 8 | A. Yes. | 8 | A. No. |
| 9 | Q. And how much of that time has been spent in | 9 | Q. Do you remember any of them? |
| 10 | another state prison? | 10 | A. Numerous. |
| 11 | A. Three years. | 11 | Q. How recently have you assisted another inmate |
| 12 | Q. And where is that? | 12 | with their lawsuit? |
| 13 | A. Florida. | 13 | A. Last night. |
| 14 | Q. Have you completed any programs while you've | 14 | Q. And who was that? |
| 15 | been incarcerated? | 15 | A. I don't know his name. He offered to ask me a |
| 16 | A. No. | 16 | question, and I gave him the answer. |
| 17 | Q. Have you held down any jobs? | 17 | Q. Do you know the names of any of the inmates |
| 18 | A. Paralegal in the law library, that's it. | 18 | you've assisted? |
| 19 | Q. And when did you have that job? | 19 | A. No. |
| 20 | A. '82, '82 to '84. Most recently, as an inmate | 20 | Q. So you've helped numerous inmates, but you |
| 21 | paralegal, I took on a pro bono case for Southern | 21 | don't know one of their names? |
| 22 | Legal Poverty, and did inmate cases in the federal | 22 | A. I know so many people's names, it's not even |
| 23 | institutions in other states. | 23 | funny. The thing is is to narrow it down to one name |
| 24 | Q. Just so you can clarify for me, was this while | 24 | as to one incident, per se, case name or case |

6 (Pages 18 to 21)

Proctor v. Taylor, et al.
Ronald Proctor

Page 22

1  citation.  Unless the paperwork is in front of me, I
2  couldn't tell you your last name.
3    Q.  Well, Mr. Proctor, I don't want you to narrow
4  it down to any specific case or incident.  I'm just
5  speaking generally.  Do you remember any inmates who
6  you've helped with their legal work?
7    A.  Last names or first names?
8    Q.  Either.
9    A.  There again, unless, unless I have a piece of
10  paper sitting in front of me that says what it is, I
11  do paperwork.  I don't go by people's names or
12  anything like that.  I do paperwork.  That's all I do.
13    Q.  When you do that paperwork, are there not names
14  on the papers?
15    A.  Yes.  But you know, they're no different than,
16  you know, a motion to compel or a motion for
17  interlocutory appeal, you know, it's just procedural.
18  And you don't -- why would you remember somebody's
19  name if it's just a motion done in a legal context?
20    Q.  So is your testimony today that you don't
21  recall one name of an inmate who you have assisted
22  with legal work?
23    A.  Well, there may have been — I can remember a
24  few last names, but, you know, I couldn't tell you any

Page 23

1  more specifics about their case than they could tell
2  you about mine because all I do is paperwork.
3    Q.  Mr. Proctor, I'm just asking you for the names,
4  not the specifics.  So if you recall a few, I'd like
5  you to tell me what they are.
6    A.  Right offhand, unless I got my files with me, I
7  can't really tell you what their last names are, you
8  know.
9    Q.  So when you just stated a minute ago that you
10  recalled a few, were you being not truthful then?
11    A.  No.  The thing is that I can remember the
12  persons, but I can't remember their names.
13    Q.  So I'm going to ask you again, is it your
14  testimony today that you don't recall one name of an
15  inmate who you have assisted with their legal work?
16    A.  Hopkins.
17    Q.  Is that a last name?
18    A.  Yes.
19    Q.  Do you know his first name?
20    A.  Not right offhand.
21    Q.  Do you recall any others?
22    A.  No.
23    Q.  So Hopkins is the only name that you recall?
24    A.  Well, like I said, there's either been, you

Page 24

1  know, 30, 50, 100, you know, they're with other
2  inmates that are incarcerated in other states.  And I
3  go through the legal entity and they send me their
4  information and I divulge their information and decide
5  whether or not what the next procedural stature is of
6  the case summation and file it appropriately and send
7  it back to them.  And then they either rewrite it or
8  retype it out or file it or they don't file it.
9  Normally they file it.  And then it goes from the next
10  step to the next step.  It's called networking through
11  legal entities.
12    Q.  So of the 30, 50 or 100 people you've helped,
13  Hopkins is the only name that you remember?
14    A.  Well, right offhand.  I mean that's come to me
15  in the last, the last 30 days that I've been in here,
16  all my paperwork is at home.  I've been trying to get
17  my paperwork in.  And like with the complaint there, I
18  don't have anything except for what's been sent to me
19  since January in this file right here.  So I basically
20  don't have anything that would assist me in either
21  determining other persons or other names or any other
22  entities that I've assisted.
23    Q.  Other than your depression which you're on
24  medication for, have you had any other medical

Page 25

1  problems?
2    A.  Nope.
3    Q.  Throughout your entire life?
4    A.  Well, I've had hepatitis, and right now I'm
5  currently being tested for short-term memory loss due
6  to ammonium levels that are so high it causes me to
7  have short-term memory loss.  And I'm taking a
8  medication for that that's supposed to alleviate the
9  amount of ammonium levels in your system.
10    Q.  What medication is that?
11    A.  I don't know the name of it yet.  The medical
12  people, they got it.
13    Q.  How often do you take that?
14    A.  Well, I was supposed to take it twice a day,
15  but since I've been here on the 9th, I haven't taken
16  it.  And I'm waiting to see a doctor in order to get
17  an order to get a blood test drawn to see, you know,
18  how high my ammonium levels are, which would also be
19  characteristic of the reason why I can't sufficiently
20  answer some of your questions, because I have either
21  attributed or short-term memory loss as far as general
22  matters are concerned unless they're right in front of
23  me.
24    Q.  Have you been diagnosed with this?

7 (Pages 22 to 25)

Proctor v. Taylor, et al.
Ronald Proctor

|  | Page 26 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. By who? |
| 3 | A. Dr. Durest and Dr. McDonald. |
| 4 | Q. Can you spell the first name for me? |
| 5 | A. D-u-r-e-s-t. |
| 6 | Q. And Dr. McDonald? |
| 7 | A. McDonald. |
| 8 | Q. Are these physicians you saw while incarcerated |
| 9 | or while you were out? |
| 10 | A. Incarcerated. |
| 11 | Q. When was the last time you saw them? |
| 12 | A. December the 20th, somewheres in there. Latter |
| 13 | part of December. |
| 14 | Q. In 2006? |
| 15 | A. Yes. |
| 16 | Q. And what was their exact diagnosis? |
| 17 | A. Well, they put me on this liquid for five days, |
| 18 | and then it brought my ammonium levels down enough but |
| 19 | they still weren't down sufficient enough, and so they |
| 20 | turned around and put me on it for 90 days. When I |
| 21 | got here they didn't put me back on them, and now I'm |
| 22 | trying to get that squared away because the, you |
| 23 | had -- you wake up and you try to figure out well, can |
| 24 | I remember what I did yesterday or can I remember what |

|  | Page 27 |
|---|---|
| 1 | I have to do with this and this. And it's almost, |
| 2 | it's a challenge just to, to be able to remember what |
| 3 | it is that you're trying to remember to do or think |
| 4 | about. |
| 5 | Q. Do you recall what the doctors diagnosed you |
| 6 | with in late December? |
| 7 | A. High ammonium levels. |
| 8 | Q. Anything else? |
| 9 | A. No. |
| 10 | Q. And were you told by them that this resulted in |
| 11 | short-term memory loss? |
| 12 | A. Yes. |
| 13 | Q. By both or one? |
| 14 | A. By Mrs. Pat and Dr. Durest both. |
| 15 | Q. Who is the first one? |
| 16 | A. Mrs. Pat. She's a registered nurse. She goes |
| 17 | over your medical problems with you before you see the |
| 18 | doctor. |
| 19 | Q. So did you see Mrs. Pat before you saw |
| 20 | Dr. Durest? |
| 21 | A. Yes. You always do. |
| 22 | Q. While you were out of jail for the eight days, |
| 23 | did you see any physicians during that time period? |
| 24 | A. No. |

|  | Page 28 |
|---|---|
| 1 | Q. Did you take any medications while you were |
| 2 | out? |
| 3 | A. All, all of them that I was supposed to, the |
| 4 | same thing I'm taking now. I took all of my |
| 5 | medications with me when I left from the institution |
| 6 | down there, including a bottle of liquid, which I |
| 7 | can't remember the name of. It's in my medical file. |
| 8 | Q. When you leave, do they give them to you to |
| 9 | take with you? |
| 10 | A. Well, they give you enough to take for a |
| 11 | certain period of time until you have time to see a |
| 12 | doctor. Normally a two-week supply. |
| 13 | Q. So when you left in December, were you given a |
| 14 | two-week supply? |
| 15 | A. Yes. |
| 16 | Q. Have you ever had any other injuries, or any |
| 17 | injuries, I should say? |
| 18 | A. I just crushed my foot in April. |
| 19 | Q. How did you do that? |
| 20 | A. Working, working in the Work Release Center, a |
| 21 | chain slipped off a loader and crushed my foot. |
| 22 | Q. Was it broken? |
| 23 | A. Yes. |
| 24 | Q. And how is it now? |

|  | Page 29 |
|---|---|
| 1 | A. I'm just off crutches, so this will be my third |
| 2 | week off crutches now. |
| 3 | Q. Was it in a cast? |
| 4 | A. Yes. |
| 5 | Q. For how long? |
| 6 | A. Since April the 27th, 2006. |
| 7 | Q. Until when? |
| 8 | A. Until three weeks ago. |
| 9 | Q. They removed the cast three weeks ago? |
| 10 | A. No, the cast was removed in November, I think. |
| 11 | Yeah, I believe it was November. |
| 12 | Q. Other than the foot injury, have you ever had |
| 13 | any other injuries? |
| 14 | A. No. |
| 15 | Q. Have you ever had any other injuries at all in |
| 16 | your childhood or as you were a teenager? |
| 17 | A. No. |
| 18 | Q. Mr. Proctor, who is Stan Taylor? |
| 19 | A. The Commissioner of Corrections until the 30th |
| 20 | of, or the 28th of February. |
| 21 | Q. And do you know why you've named him as a |
| 22 | defendant in your complaint? |
| 23 | A. Because he is the Commissioner of Corrections. |
| 24 | Statutory conferred. |

8 (Pages 26 to 29)

Proctor v. Taylor, et al.
Ronald Proctor

Page 30

1    Q.  What is statutory conferred?
2    A.  His position as Commissioner of Corrections.
3    Q.  What actions did he take in this specific
4    lawsuit to violate your rights?
5    A.  His "respedent" superior affirmations under
6    Title 11-6500.
7    Q.  Have you ever had a conversation with Stan
8    Taylor?
9    A.  No.
10   Q.  Have you ever corresponded with him about this
11   litigation?
12   A.  Sent him letters, yes.  Sent him letters in
13   regards to incidents that occurred and notifications
14   through his subordinates.
15   Q.  Do you recall when you sent those letters?
16   A.  They're in the complaint.
17   Q.  Well, I'm asking you.
18   A.  Well, I need to see the complaint again if you
19   want specific dates.
20   Q.  I'd just like to know from your recollection if
21   you recall when you sent those letters?
22   A.  No.
23   Q.  You said respondeat superior is why you've
24   named --

Page 31

1    A.  "Respedent" superior.
2    Q.  -- Stan Taylor in this action; is that right?
3    A.  "Respedent" superior.
4    Q.  You've named Stan Taylor for "respedent"
5    superior?
6    A.  Yes.
7    Q.  I guess you'll have to explain that to me,
8    because I'm not familiar with "respedent" superior.
9    Why don't you explain to me what that means to you.
10   A.  Just what the termination means, exactly that,
11   "respedent" superior.  He's the head person in charge
12   of his subordinates' actions.  He's in charge of
13   Department of Corrections.  He's in charge of
14   Department of Corrections codified by state statute.
15   Q.  Okay, so in your description, is it fair to say
16   he is a supervisor?
17   A.  He would be, he would be codified by statute as
18   the Commissioner of Corrections.
19   Q.  I guess I'm here, Mr. Proctor, I'd just like you to tell
20   me in your words why you've named Mr. Taylor, without
21   using legal terms, just tell me why you've named Stan
22   Taylor in your lawsuit.
23   A.  Well, I don't know.  I have to look at the
24   complaint to see why I have.  I don't know why unless

Page 32

1    I look at the complaint.
2    Q.  You don't have any of your own recollection why
3    you named him?
4    A.  "Respedent" superior.
5    Q.  Okay.  You keep saying "respedent" superior,
6    but you're not explaining to me what it means other
7    than pointing to a statute.  So I'd just like you to
8    put in your own words what you think that means.
9    A.  He is in charge of every other persons under
10   him.
11   Q.  Who is Tom Carroll?
12   A.  Thomas Carroll?
13   Q.  That's correct.
14   A.  Thomas Carroll is the warden of the
15   institution, Delaware Correctional Institution.
16   Q.  And why have you named him as a defendant in
17   this action?
18   A.  Again, unless I see the complaint, I don't know
19   why.
20   Q.  So your testimony today is you don't know why
21   you've named him?
22   A.  Probably the same reason as I named Taylor,
23   "respedent" superior.
24   Q.  Who is Thomas Seacord?

Page 33

1    A.  He's a lieutenant.
2    Q.  Where?
3    A.  DCC Smyrna.
4    Q.  And why have you named him as a defendant in
5    your complaint?
6    A.  Because he was told the day of the incident
7    when they put me in the cell next to Wayne Thomas that
8    I shouldn't go in the cell or be on the same tier with
9    him, based on the court order that says I should have
10   no contact with him.
11   Q.  Lieutenant Seacord told you this?
12   A.  I told him that.
13   Q.  I see.  And what date was that?
14   A.  September the 7th, 2005.
15   Q.  And where were you held at that time?
16   A.  DCC Smyrna.
17   Q.  And what security level?
18   A.  SHU transition.
19   Q.  And what actions would you say Lt. Seacord took
20   to violate your civil rights?
21   A.  He failed to acknowledge and/or protect by
22   placing me in the cell next to an inmate who I should
23   have no contact with, and was told prior to me being
24   placed in the cell that I should not be placed in the

9 (Pages 30 to 33)

Proctor v. Taylor, et al.
Ronald Proctor

Page 34

1   cell or have any contact with this certain inmate,
2   Wayne Thomas.
3       Q. And other than that day on September 7, 2005,
4   did you have any other conversations with Lt. Seacord
5   about this lawsuit?
6       A. Again, I'm not sure unless I look at the
7   complaint.
8       Q. Who is Frank Kromka?
9       A. He's property room officer.
10      Q. Where?
11      A. DCC Smyrna.
12      Q. And why have you named Frank Kromka in your
13  complaint?
14      A. Again, I have to see the complaint in order to
15  determine what it is that I named him in there.
16      Q. Do you recall specifically the subject matter
17  of your complaint?
18      A. Failure to protect and other various
19  constitutional violations.
20      Q. All right, well let's talk about that a little
21  bit. What is the basis for your failure to protect
22  claim in your complaint?
23      A. I need to see a copy of the complaint in order
24  to answer that question.

Page 35

1       Q. You drafted the complaint, correct?
2       A. In 2005, yes.
3       Q. So I'd just like to ask you questions from your
4   memory then related to the instances, okay? Your
5   complaint alleges no-contact orders. Do you recall
6   that?
7       A. Yes.
8       Q. Tell me about the no-contact orders.
9       A. Those are no-contact orders issued by courts of
10  competent jurisdiction in order for me not to have
11  access or for another person to have access to any
12  incidents concerning me or them.
13      Q. Who is "them"?
14      A. Wayne Thomas and Robert Ashley.
15      Q. And what courts were these issued by?
16      A. Superior Court of New Castle County.
17      Q. And do you have a copy of these orders?
18      A. In the file I do, yes.
19      Q. In what file?
20      A. The file that I've been trying to get in here
21  since the 9th of January. Supposedly a Carol Powell
22  is supposed to let my family know how to bring my
23  files up here to me. I was out for eight days. The
24  eight days I was out, I came back in here, I have not

Page 36

1   had access to my files. And I even wrote you a letter
2   expressing that if I didn't have access to my files,
3   that I would not do the deposition and/or be able to
4   answer any questions without referring to my complaint
5   or other entities that I have within the file of this
6   action.
7       Q. Tell me a little bit more about the no-contact
8   orders. They were issued by Superior Court when?
9       A. I don't know unless I look at the file.
10      Q. Can you approximate?
11      A. They've been issued by Superior Court, New
12  Castle County, derived from criminal proceedings,
13  either as a witness or a victim.
14      Q. And what specifically do they say about no
15  contact?
16      A. It means just that, no contact.
17      Q. Was it your case?
18      A. No, it was a state case.
19      Q. Against who?
20      A. Against these two entities, inmates.
21      Q. And tell me again who they are.
22      A. Robert Ashley and Wayne Thomas.
23      Q. And were you named in any of the court orders?
24      A. Either as a witness or a victim. Witness in

Page 37

1   Robert Ashley, a victim in Wayne Thomas.
2       Q. And did it specifically say "Ronald Proctor" in
3   the order?
4       A. Yes, it does.
5       Q. And you have copies of these orders in your
6   legal files at home?
7       A. And they're a matter of public record.
8       Q. Do you know the details of the state cases
9   against Robert Ashley and Wayne Thomas?
10      A. Those are a matter of public record.
11      Q. Well, I'm asking you.
12      A. I don't know the specifics. Is that what
13  you're asking me?
14      Q. Yes, I am.
15      A. I don't know any specifics, other than there
16  was an order issued, no contact. And it's contained
17  within the inmate's file and it's provided to the
18  wardens of the institutions in which they are confined
19  in under Title 11-3903.
20      Q. Were you a victim or a witness in the Wayne
21  Thomas case?
22      A. Victim.
23      Q. You were a victim of the crime he was charged
24  with?

10  (Pages 34 to 37)

Proctor v. Taylor, et al.
Ronald Proctor

Page 38

1    A. Yes.
2    Q. Yet you're testifying you don't know the
3  specifics of that case.
4    A. Specifics of the case is that he took a plea to
5  the lesser included offense, and the court issued a
6  no-contact order.
7    Q. My question is, what are the facts surrounding
8  the crime that Mr. Thomas was charged with?
9    A. Mr. Thomas was charged with assault after he
10  punched me in the face and caused extended damages to
11  my, both my teeth and my jaw and a broken nose.
12    Q. Where did this occur?
13    A. Gander Hill.
14    Q. And when?
15    A. Could have been I think in the early '90s, '94,
16  somewhere around there.
17    Q. And do you recall the date of the court order?
18    A. Not right offhand unless I had the file in
19  order to verify.
20    Q. Do you recall approximately the year?
21    A. It had to have been in '94, '95.
22    Q. Now, Mr. Proctor, when I asked you earlier if
23  you had any other injuries besides your foot, you did
24  not mention the broken nose, correct?

Page 39

1    A. Well you talk -- I thought you meant permanent
2  injuries.
3    Q. So let's go back to that question. What other
4  injuries have you had other than a broken foot?
5    A. Well then, I guess you would have to start from
6  the day I was born to date, and that would probably
7  take about another six hours.
8    Q. Well, when I was questioning you earlier, I
9  asked you specifically what injuries did you have in
10  your childhood. Do you recall that?
11    A. Yes, you did.
12    Q. And do you recall telling me that you did not
13  have any?
14    A. In general terms.
15    Q. So are you going to change your testimony now?
16    A. No. That was an injury.
17    Q. So is it still your testimony that during your
18  childhood you had no other injuries?
19    A. Yes, until my adult life.
20    Q. Other than the broken nose that we just found
21  out about and the broken foot, have you had any other
22  injuries at all during your life?
23    A. A broken clavicle, dislocated right knee,
24  broken nose, fractured jaw, two broken teeth that

Page 40

1    Mr. Thomas did, if you want to add those to it. I
2  don't know exact, the exact injuries unless I had the
3  file in order to look at to see whether or not what it
4  was that, what type of injuries I sustained.
5    Q. All right, well you're doing fairly well
6  remembering at least some of them. So are those the
7  only ones you remember, or are there any others that
8  you can recall?
9    A. No.
10    Q. Where did you break your clavicle, where were
11  you?
12    A. Automobile accident.
13    Q. And do you recall when that was?
14    A. 1997.
15    Q. And how about your right knee, you said that
16  was dislocated; is that right?
17    A. In '98.
18    Q. And were you treated by a physician for that
19  injury?
20    A. Yes.
21    Q. And for the clavicle injury as well?
22    A. Yes.
23    Q. Would you say both of those have fully repaired
24  themselves at this point?

Page 41

1    A. Yes and no.
2    Q. And can you explain?
3    A. Well, some of them, I still have problems with
4  my knee, and the clavicle I can't sleep without
5  elevated head because the bone sticks into my lung.
6  So it's ongoing condition.
7    Q. How about the fractured jaw, when did that
8  occur?
9    A. That occurred with an incident in La Plata,
10  Maryland, where I was incarcerated for possession of
11  marijuana. And an inmate -- I was involved in an
12  escalated riot on the cell block, and an inmate struck
13  me in the jaw and caused it to be fractured.
14    Q. And when was that?
15    A. '92.
16    Q. What was the institution?
17    A. Charles County Sheriff's Department.
18    Q. And would you say that injury is recovered at
19  this point?
20    A. Yes.
21    Q. Mr. Proctor, I did ask you earlier on in the
22  deposition whether you'd been incarcerated in any
23  other states, and you testified as to Delaware and
24  Florida. Do you recall that?

11 (Pages 38 to 41)

Proctor v. Taylor, et al.
Ronald Proctor

Page 42

1    A. Yes.
2    Q. Is it now your testimony that you were also
3  incarcerated in Maryland?
4    A. As a pretrial detainee, not as someone serving
5  time.
6    Q. But you were in a prison in Maryland?
7    A. No. I was in a sheriff's department pretrial
8  detainee facility. There's a difference. You asked
9  me if I had ever been incarcerated in any other
10  states, and I said yes, Florida. Incarcerated means
11  extended period of time, more than a few days. As a
12  pretrial detainee, which I was only held in Maryland
13  at that time for less than 34 days, therefore, I was
14  not incarcerated. I was a pretrial detainee.
15    Q. Mr. Proctor, when you were in Maryland, were
16  you behind bars?
17    A. No, I was in — it was in a correctional — it
18  was in a sheriff's pretrial detainee setting
19  institution. It's not incarcerated. You weren't
20  incarcerated, being held in lieu of bail as a pretrial
21  detainee.
22    Q. Let me ask you this, Mr. Proctor. When you
23  were in Maryland as a pretrial detainee, were you
24  allowed to leave whenever you wanted to?

Page 43

1    A. No.
2    Q. Are there any other states where you were held
3  and not allowed to leave in any institution other than
4  Maryland, Florida and Delaware?
5    A. Yes.
6    Q. What other states?
7    A. None.
8    Q. Okay, I just asked you if there were any other
9  states --
10    A. I misunderstood your question.
11    Q. Would you like me to repeat it?
12    A. The answer is no.
13    Q. Are there any other states, other than
14  Maryland, Florida, and Delaware, where you were held
15  by officials and not allowed to leave due to pending
16  criminal charges?
17    A. No.
18    Q. We've covered your clavicle injury, your knee
19  injury, your broken nose, fractured jaw and broken
20  teeth. Are there any other injuries that you
21  recall -- and your foot earlier. Any other injuries
22  that you recall at this time?
23    A. No.
24    Q. We talked also a little bit about the

Page 44

1  no-contact order with Wayne Thomas, now I want to
2  cover the one with Robert Ashley. Were you a victim
3  or a witness in the Robert Ashley case?
4    A. Witness.
5    Q. And do you recall what the charges were against
6  Mr. Ashley?
7    A. Murder.
8    Q. And do you know where this occurred?
9    A. Here at DCC Smyrna.
10    Q. And when was that?
11    A. I don't know the specific year.
12    Q. Do you recall approximately the time period?
13    A. '94. Again, I'd have to look at the file in
14  order to determine that.
15    Q. Earlier we were talking about Thomas, and that
16  was around '94, '95 as well. From your memory do you
17  recall them being close in time?
18    A. Close in time?
19    Q. The Thomas case and the Ashley case, close in
20  time to each other.
21    A. The Thomas case was in approximately the same
22  time period, yes. Within two years of each other.
23    Q. What did you witness in the Thomas case?
24    A. Thomas case? I wasn't a witness. I was a

Page 45

1  victim.
2    Q. The Ashley case, what did you witness?
3    A. I was a witness that Robert Ashley had written
4  me letters concerning how he was going to F up another
5  inmate. And he later ended up ended up killing the
6  same inmate.
7    Q. Was there any other extent of your involvement?
8    A. That, and to determine whether or not, where
9  the weapon could have been hidden.
10    Q. How would you have known that?
11    A. They were using me as a go-between between them
12  and the incident that occurred with Robert Ashley, and
13  I suggested, said that he would put it somewhere
14  where he would be able to go back and get to it at a
15  later time. And it was determined that the weapon was
16  hidden down the side of a cardboard box.
17    Q. Who is "they"? You said "they" were using you.
18    A. Lawrence McGuigan. He was the internal
19  affairs, he just recently passed away two months ago.
20    Q. Anyone else?
21    A. Captain George Martino.
22    Q. Anyone else?
23    A. Some people from Delaware state prison --
24  Delaware State Police.

Proctor v. Taylor, et al.
Ronald Proctor

| Page 46 | Page 48 |
|---|---|

**Page 46**

1    Q.  Do you recall their names?
2    A.  No, they were detectives.
3    Q.  How many were there?
4    A.  Two.
5    Q.  When you went to SHU on September 7th of 2005,
6    what contact did you have with Wayne Thomas after that
7    time period?
8    A.  I'd have to see the complaint in order to
9    answer that question.
10   Q.  Do you have any independent recollection of the
11   contact?
12   A.  No.
13   Q.  Do you have any independent recollection of the
14   contact you had with Robert Ashley?
15   A.  Excuse me, what did you say?
16   Q.  When you went to SHU, we're talking about
17   September 7th of 2005, do you recall what contact you
18   had with Robert Ashley?
19   A.  Again, I'd have to see the complaint in order
20   to determine what the dates were.  Could I see that
21   complaint, please?
22   Q.  I'm going to ask you questions about the
23   complaint and we're going to go through it and you'll
24   have an opportunity to do that.  Right now I'm just

**Page 47**

1    asking you what you remember.
2    A.  Unless I see the complaint, I can't adequately
3    answer your question.
4    Q.  So I'm going to ask again:  Do you have any
5    independent recollection of the contact that you had
6    with Robert Ashley after September of 2005?
7    A.  Incidents that were specific incidents whereas
8    though I was either going to be transported with him
9    or was placed in the cell next door to him or would
10   have contact with him.
11   Q.  What specific incident do you recall about
12   being transported with Mr. Ashley?
13   A.  That was with Capt. Clyde Segars going to
14   dental.
15   Q.  You were going on a dental visit?
16   A.  And Lt. Seacord.  We were going to dental.
17   Q.  And how were you transported there?
18   A.  Same way, handcuffed, but you have contact with
19   each other in the van going over and while you're
20   there.
21   Q.  And you're handcuffed during the transport; is
22   that right?
23   A.  You're handcuffed, yes.
24   Q.  And was Mr. Ashley also handcuffed?

**Page 48**

1    A.  Yes.
2    Q.  Do you recall, I know you might not remember
3    the exact date, but do you recall the approximate
4    time, considering we're speaking of 2005, do you
5    remember what month it was when you went on this
6    dental visit?
7    A.  It was -- without reviewing the file, I can't
8    name a specific date.  It was sometime I think in
9    2005.
10   Q.  And what happened during the transport?
11   A.  What happened during the transport?  We never
12   got transported because I disclosed to the officers
13   that I refused to go based on my no-contact order with
14   this inmate.
15   Q.  When did you disclose that to them?
16   A.  When I was put in the cell next to him and I
17   realized that we would be going to dental together.
18   Q.  So the dental trip never occurred; is that
19   right?
20   A.  No.
21   Q.  What other specific incidents do you recall
22   having contact with Robert Ashley?
23   A.  Again, that's the only one that comes to my
24   recollection until I see a chance to review the

**Page 49**

1    complaint.
2    Q.  So the only one that you specifically recall
3    from your memory is the dental visit where you were to
4    be transported together, but that never actually
5    occurred, correct?
6    A.  Yes.
7    Q.  And we may have covered this, but just in case
8    I forgot, do you recall any specific incidents of
9    Wayne Thomas and having contact with him?
10   A.  Yes.
11   Q.  Tell me about what you recall.
12   A.  Unless I review the complaint, I can't give you
13   specifics about it.  But I was getting ready to be
14   placed in the cell next door to him by Lt. Seacord and
15   St. John Doe, and I specifically told both of them
16   that I have a court order not to have any contact with
17   this inmate.  And they said, "Well, don't worry, you
18   won't have no contact with him," and stuck me in the
19   cell next door to him for eight months.
20   Q.  Okay.  And you were in your cell and this is in
21   SHU, is that right?
22   A.  That's correct.
23   Q.  And you testified earlier that in SHU you're in
24   individual cells; is that right?

13 (Pages 46 to 49)

Proctor v. Taylor, et al.
Ronald Proctor

## Page 50

1    A.  Individual cells, but that doesn't mean you
2  don't have contact.
3    Q.  And how would Mr. Thomas have had contact with
4  you?
5    A.  Well, either he would have contact when they
6  opened the food flaps when you go to get fed and the
7  guard opens all the food flaps, and he's in the cell
8  right next door to you, and there's approximately a
9  two-and-a-half-to-three-foot wall in between the two,
10  and at that time he slings urine and "fetus" up
11  through your food flap into your cell.  And --
12    Q.  Okay, and did this happen?
13    A.  Numerous times.  In eight months it happened
14  approximately 50 times.
15    Q.  Fifty times in eight months he's flung urine
16  and what in your cell?
17    A.  "Fetus," all over the outside window flap.  The
18  food, he would take the food tray and sling it like
19  this here into my food flap, and it comes through
20  the food flap into my cell area.  And I would report
21  it to the CO's.  Plus, I have a direct inmate witness
22  who was the tier man who had to clean all this up for
23  eight months' period of time.  And his name is Carlos
24  Gunthers.

## Page 51

1    Q.  Gunthers?
2    A.  Yes.
3    Q.  Now, Mr. Proctor, if you could just help me to
4  visualize a little bit.  In SHU you say the food flap,
5  is that the only access to outside of the cell?
6    A.  No.  You have access when you go outside the
7  cell in the cage areas where he bagged up piss in
8  baggies that they give you on the trays here, he bags
9  them up and then when you walk around and he gets near
10  you -- if you get near him, then he throws that
11  through the fence.
12    Q.  I guess my question wasn't clear.  I mean the
13  actual cell itself, is it a sliding door or is it
14  bars?
15    A.  No, it's sliding door.
16    Q.  Okay.  And then the only access between the
17  cell and outside is the food slot; is that right?
18    A.  Yes.
19    Q.  Is that an accurate description?
20    A.  Yes.
21    Q.  And when is that slot opened?
22    A.  Whenever a CO opens it prior to trial -- or
23  prior to chow.
24    Q.  And how long is it open for?

## Page 52

1    A.  Sometimes it's opened for, just putting the
2  food tray in there and closing it.  Other times it's
3  left open for 15, 20 minutes at a time while the chow
4  is being served.
5    Q.  Do they go to each cell individually or do they
6  do them all at once?
7    A.  Beg pardon?
8    Q.  Do they go to each cell individually to serve
9  the food or do they do it all at once?
10    A.  Each cell is served the food individually.  But
11  they open all the food flaps at one time.  Then they
12  come along and they put the trays in the food flap.
13    Q.  Do you know why sometimes they would just open
14  one at a time and other times they would be opened the
15  entire time?
16    A.  Insubordination, not following the rules.  The
17  food flaps are never supposed to be left open.  The
18  food flaps are supposed to be opened enough to put the
19  tray in, closed back up.  But the guards, instead of
20  having to reopen the food flap two times, they open it
21  one time and leave it open till after the chow has
22  been fed.  This allows other inmates to either pass
23  things or throw things out of the cell onto the
24  hallway or down the tier, or like me next door, to

## Page 53

1  even sling "fetus" and urine through the food flap
2  into my cell area.
3    Q.  And do you know how the officers open the food
4  flap?
5    A.  With a key.
6    Q.  For each flap?
7    A.  Yep.  When they're open, it automatically drops
8  down and leaves an opening of about 5-by-14 inches
9  wide -- or no, about 6-1/2-by-14 inches wide hole into
10  your cell area from outside.
11    Q.  And had you told any officers or filed any
12  grievances related to these incidents?
13    A.  Yes.
14    Q.  Who did you tell?
15    A.  Without reviewing the complaint, I can't give
16  you any specifics.  I know that I notified them, they
17  were aware of it.  Some would not leave -- would open
18  all the other flaps and leave ours closed in order to
19  prevent these incidents from taking place.
20    Q.  Do you recall filing any grievances related to
21  these incidents?
22    A.  Without reviewing the complaint, I can't give
23  you specifics.  But I did.  Either notified the CO's
24  or they saw what happened after they left the food

14  (Pages 50 to 53)

Proctor v. Taylor, et al.
Ronald Proctor

Page 54

1  flap open and all the food was slammed up against the
2  wall and all out through the outside of the cell area
3  from the cell next door.
4    Q.  I guess I'm going to repeat my question,
5  because that wasn't exactly an answer.  My question
6  was related to grievances.  Did you file any
7  grievances related to these incidents?
8    A.  Yes.
9    Q.  Do you recall how many?
10   A.  Without reviewing the complaint, I cannot
11 answer that specifically.
12   Q.  Do you recall if you filed more than one?
13   A.  Without reviewing the complaint, I can't answer
14 that specifically.
15   Q.  Well, Mr. Proctor, you did say earlier that you
16 at least recall filing some grievances.  Is that
17 right?
18   A.  I knew that I did the proper thing.  Obviously
19 you can't not file or have someone have common
20 knowledge that someone just slung "fetus" and urine
21 all over the outside of a cell, because it's obvious
22 that it just took place.  So yes, they were aware of
23 incidents.
24   Q.  Okay.  My question again was do you recall

Page 55

1  filing grievances in relation to the incidents?
2    A.  Yes.
3    Q.  Do you recall if there was more than one?
4    A.  Not without reviewing the complaint, I cannot
5  give you any specifics.
6    Q.  Do you independently recall at least one of
7  them?
8    A.  Without reviewing the complaint, I can't give
9  you any specifics.
10   Q.  Okay.  So when you testify that you recall
11 filing a grievance, is that inaccurate testimony?
12   A.  Without reviewing the complaint, I cannot
13 provide you with specifics.
14   Q.  Mr. Proctor, I'm not asking you for specifics.
15 I'd just like to know if you remember filing
16 grievances, and if so, how many you remember filing.
17 If you don't remember filing any at all, that's fine.
18   A.  Without reviewing the complaint, I can't give
19 you any specifics.
20   Q.  So is it your testimony that you do not recall
21 filing any?
22   A.  I filed grievances.
23   Q.  Is it your testimony that you recall filing
24 them, you just don't recall how many?

Page 56

1    A.  Yes.
2    Q.  And what injury did you suffer as a result of
3  these incidents?
4    A.  Without reviewing the complaint, I cannot
5  provide you specifics.
6    Q.  Are you injured now from these incidents?
7    A.  No.
8    Q.  Do you recall ever being injured from these
9  incidents?
10   A.  Without reviewing the complaint, I cannot
11 provide you specifics.
12   Q.  Okay, Mr. Proctor, I'm asking from your memory.
13 If you don't remember, you can say so.  I'm asking
14 from your memory, do you recall suffering any injury
15 from these incidents?
16   A.  Yes.
17   Q.  Do you remember what injury you suffered?
18   A.  Without reviewing the complaint, I cannot
19 provide you specifics.
20   Q.  Mr. Proctor, we could be here all day at this
21 rate.  My question is what you remember.  If you do
22 not remember, feel free to say, "I do not remember."
23 If you do remember something, I'm asking you what you
24 remember.

Page 57

1    A.  I do not remember.
2    Q.  Do you recall if you were injured more than one
3  time from these incidents?
4    A.  Without reviewing the complaint, I cannot
5  provide you specifics.
6    Q.  So is it your testimony today that you don't
7  have any memory of what the injuries were?
8    A.  Without reviewing the complaint, I cannot
9  provide you specifics.
10   Q.  Mr. Proctor, would you like to take a break?
11   A.  No.
12   Q.  Do you feel comfortable continuing?
13   A.  I'm fine.
14   Q.  Do you understand that what I'm asking you is
15 what you remember and not what's in your complaint?
16 Do you understand that?
17   A.  And again, without reviewing the complaint, I
18 cannot provide you specifics.
19   Q.  Do you understand that what I'm asking you is
20 from your memory and not from your complaint?
21   A.  Yes.
22   Q.  So do you understand that if you don't remember
23 something, you can feel free to say, but if you do
24 remember, I'd just like you to tell me what you

15 (Pages 54 to 57)

Proctor v. Taylor, et al.
Ronald Proctor

---

Page 58

1  remember?
2  **A.  No.**
3  Q.  You don't understand that?
4  **A.  Without reviewing the complaint, I cannot**
5  **provide you with any specifics.**
6  Q.  Do you understand the concept of memory?
7  **A.  Yes.**
8  Q.  So if I asked you something about yesterday,
9  you would tell me whether or not you remember what
10 happened yesterday, correct?
11 **A.  Yes.**
12 Q.  So if I ask you something about a year ago, you
13 would tell me whether or not you remember what
14 happened a year ago, correct?
15 **A.  And if it's concerning this case, without**
16 **reviewing the complaint, I cannot provide you with any**
17 **specifics.**
18 Q.  So is your testimony that you refuse now to
19 testify as to anything that you remember?
20 **A.  Without reviewing the complaint, I cannot**
21 **provide you with any specifics.**
22 Q.  Let's move forward to the rest of the
23 defendants you named.  Do you know who Brian Engrem
24 is?

---

Page 59

1  **A.  Yes.**
2  Q.  And who is Brian?
3  **A.  He's an employee here, works in the law**
4  **library.**
5  Q.  And have you had conversations with Brian
6  before?
7  **A.  Yes.**
8  Q.  What have you discussed with him about this
9  particular case?
10 **A.  Without reviewing the complaint, I cannot**
11 **provide you with any specifics.**
12 Q.  Do you remember discussing anything with him?
13 **A.  No.**
14 Q.  Do you remember what actions you believe he
15 took to violate your civil rights?
16 **A.  Without reviewing the complaint, I cannot**
17 **provide you with any specifics.**
18 Q.  Do you remember what actions he took to violate
19 your civil rights?
20 **A.  No.**
21 Q.  Who is David Pierce?
22 **A.  Deputy warden.**
23 Q.  Of what?
24 **A.  SHU and the MHU.**

---

Page 60

1  Q.  And you have named him as a defendant in your
2  complaint.  Do you recall what actions David Pierce
3  took to violate your rights?
4  **A.  No.**
5  Q.  Have you ever had a conversation with David
6  Pierce?
7  **A.  No.**
8  Q.  I'd just like to ask you a little bit about
9  what you're seeking from the lawsuit.  Why did you
10 file it?
11 **A.  Without reviewing the complaint, I cannot**
12 **provide you with any specifics.**
13 Q.  Are you seeking any money damages?
14 **A.  Without reviewing the complaint, I will not —**
15 **cannot provide you with any specifics.**
16 Q.  And do you know what amount of money you're
17 seeking?
18 **A.  Without reviewing the complaint, I cannot**
19 **provide you with any specifics.**
20 Q.  Since you've been incarcerated most recently,
21 have you been to medical?
22 **A.  Yes.**
23 Q.  When was the last visit?
24 **A.  Yesterday.**

---

Page 61

1  Q.  You went yesterday; is that right?
2  **A.  Yes.**
3  Q.  And what did you go for?
4  **A.  I just spoke to her through the flap and she**
5  **handed me my medication.**
6  Q.  When you take your medications, do you have to
7  typically go there or do they come to you?
8  **A.  They come to you.**
9  Q.  So why is it that you went there yesterday for
10 your medications?
11 **A.  Because they come to you.  They bring your**
12 **medication to you every day, every time you get it,**
13 **they bring it to you.**
14 Q.  I see.  So when you saw medical yesterday, it
15 was when they were bringing you your medication?
16 **A.  Yes.**
17 Q.  And who was that?
18 **A.  Just a nurse that hands out the medication.**
19 Q.  And other than a medical person coming to you
20 to bring you medicine, have you gone out on a sick
21 call or a medical visit where you had to go to them
22 since you've been incarcerated most recently?
23 **A.  No.**
24 Q.  And do you recall, I know you were out for

---

16 (Pages 58 to 61)

Proctor v. Taylor, et al.
Ronald Proctor

Page 62

1   eight days in December, but prior to that, last year,
2   do you recall your last visit to a physician?
3       A.  Sometime in December.
4       Q.  And in December were you in DCC at that time?
5       A.  SCI.
6       Q.  So when you went on this doctor visit you were
7   in SCI; is that right?
8       A.  Yes.
9       Q.  And is that when you saw Nurse Pat and
10  Dr. Durest?
11      A.  Yes.
12      Q.  Other than what we discussed earlier about the
13  medications they were going to be giving you, did you
14  see them for anything else?
15      A.  No.
16      Q.  And do you recall prior to December the last
17  time you went to see a physician?
18      A.  Seen him in November, seen him again in the
19  month before that.  Whenever we put in a sick call
20  slip, you see them.
21      Q.  Do you recall what you went to the physician
22  for in November?
23      A.  Be the same thing, my foot.
24      Q.  You said "the same thing."  Is that why you

Page 63

1   went in December?
2       A.  Yep.
3       Q.  Were you having regular visits with the doctor
4   because of your foot?
5       A.  Yes.
6       Q.  And were these scheduled typically every other
7   week, every other month?  How often were you seeing a
8   physician?
9       A.  Whenever you put in a sick call slip, they'd
10  see you.
11      Q.  And were these on average a certain amount of
12  time, or it was pretty random?
13      A.  Whenever you put in a sick call slip, they'll
14  see you.
15      Q.  Okay, you said you saw a physician in December
16  and then a month before that in November.  Do you
17  recall if you went in October?
18      A.  No.
19      Q.  You didn't go or you don't recall?
20      A.  Don't recall.
21      Q.  From April until December do you recall seeing
22  a physician for anything other than your foot?
23      A.  Numerous, numerous different incidents about my
24  foot, my hep C, sinus.  Whenever you put in a sick

Page 64

1       call slip they see you.
2       Q.  Your foot, hep C, your sinus.  Your sinus is an
3   ongoing problem?
4       A.  Yes.
5       Q.  Do you have regular medication for that?
6       A.  Yes.
7       Q.  What is it?
8       A.  I'm not taking it right now, though.
9   Sinequan -- or Sudafed.
10      Q.  Do you typically take that when your sinuses
11  are acting up?
12      A.  Yes.
13      Q.  Do you receive any regular treatment for hep C?
14      A.  Yes.
15      Q.  What type of treatment?
16      A.  Blood, blood work and multi-vitamin without
17  iron.
18      Q.  And how often would you say you get that?
19      A.  Every 90 days.
20      Q.  If you wouldn't mind just giving me a minute.
21          Did you incur any of your own
22  out-of-pocket medical expenses in relation to this
23  complaint?
24      A.  No.

Page 65

1       Q.  All right, I'm going to give you a copy of the
2   complaint now and we'll turn to that.  This was
3   previously admitted as Exhibit A.
4       A.  This isn't the original complaint.  This is the
5   amended.  Do you have the original complaint?
6       Q.  Mr. Proctor, this is the complaint that's part
7   of the court docket --
8       A.  Right.
9       Q.  -- that we're addressing today.  That's the one
10  that has been accepted by the court.  Whether or not
11  there was an original that was dismissed, I'm not
12  sure.
13          Okay, turn to the third page.  Actually,
14  1, 2, 3, fourth page.
15      A.  Oh, this is the amended.  This is the amended,
16  8-24-05.
17      Q.  Mr. Proctor, can you turn to the fourth page?
18  All right, right on the top it says, "All defendants
19  have become aware of," do you see that?
20      A.  "All defendants have become aware of and failed
21  to act or prevent incidents of assault against my
22  person by the direct failure to prevent act, etc.,
23  even after numerous grievances, affidavits.  (See
24  Exhibit A.)"

17 (Pages 62 to 65)

Proctor v. Taylor, et al.
Ronald Proctor

Page 66

1    Q.  Now, I'd just like to talk about that line for
2    a minute, and I'd like you to tell me, and we'll go
3    through each defendant and I want you to tell me how
4    they became aware of the alleged incidents.  Okay?  Do
5    you understand, Mr. Proctor?
6    A.  What did you say now?
7    Q.  I'm going to go through each of the defendants
8    you've named in your complaint, and I'd like you to
9    tell me how you believe they became aware of the
10   incidents.  Do you understand that?
11   A.  Well, it's right here.  They became aware of
12   them as to the exhibits.  Are you saying reiterate
13   or --
14   Q.  I'm going to ask you questions, and I'm just
15   giving you a preview of where I'm going.  Do you
16   understand what topic I'm going to cover now?
17   A.  Um-hum.
18   Q.  Okay.  You state in your complaint, "All
19   defendants have become aware of and failed to act or
20   prevent incidents of assault against my person."  I'd
21   like you to tell me how Stan Taylor became aware of
22   the incidents.
23   A.  He became aware of the incidents because he's
24   "respedent" superior over his subordinates and orders

Page 67

1    of the courts.
2    Q.  Do you have any reason to believe that Stan
3    Taylor had any personal knowledge of these incidents?
4    A.  No.
5    Q.  How is it that you think Tom Carroll became
6    aware of these incidents?
7    A.  Through the complaints and the letters
8    submitted.
9    Q.  And what complaint and/or letter are you
10   referring to?
11   A.  The February 10th, 2005 letter to Deputy Warden
12   Elizabeth Burris.
13   Q.  Is this letter addressed to Tom Carroll?
14   A.  It's addressed to E. Burris.
15   Q.  Do you have any reason to believe that Warden
16   Carroll would have had any personal knowledge of these
17   incidents?
18   A.  They would have how many?
19   Q.  Did you want me to repeat the question?
20   A.  Yes.
21   Q.  Did you have any reason to believe that Tom
22   Carroll, Warden Carroll would have any personal
23   knowledge of the alleged incidents?
24   A.  Via the copies of the 2-10-05 letter.

Page 68

1    Q.  But this letter was not addressed to him,
2    correct?
3    A.  No, it was not.
4    Q.  Now, we're still talking about the same line,
5    you said, "Defendants have become aware of."  I'd like
6    to know how Lt. Seacord became aware of the incidents.
7    A.  As disclosed in the Exhibit A-1, that on 9-7-05
8    while being placed in a cell next to inmate Thomas,
9    Wayne Thomas, I specifically told Lt. Seacord and a
10   sergeant that I should not be placed in the cell next
11   door to him.
12   Q.  Now how about Frank Kromka, how would he have
13   become aware of the allegations?
14   A.  I can't find -- either you got -- there's a
15   page amended out of here, because this ends on page 2,
16   and this one only has page 4 as the last page.  Page 3
17   is missing.
18   Q.  Mr. Proctor, I promise you, this is an exact
19   copy from the docket.
20   A.  Well here, look.
21   Q.  -- at the court.
22   A.  There is page 2 right there.  Where is page 3?
23   Q.  Do you have any statement as to why Frank
24   Kromka would have had any knowledge of the allegations

Page 69

1    in your complaint?
2    A.  No.
3    Q.  I think the next one was Brian Engrem.  How
4    would he have become aware of either the no-contact
5    order or the incidents alleged in your complaint?
6    A.  By affidavit.  He was provided with copies of
7    affidavits that were given to him and he kept them.
8    Q.  And what do you believe Brian Engrem did to
9    violate your civil rights?
10   A.  He kept my legal papers.
11   Q.  I guess in relation to the allegations in this
12   complaint, which is failure to protect, what do you
13   believe Brian Engrem did to violate your civil rights?
14   A.  He prevented the affidavits -- he did not
15   provide the copies of the affidavits back to me, or he
16   prevented them from being disclosed to supervisors.
17   Q.  And how does that relate to the allegations in
18   this complaint?
19   A.  These were affidavits that were concerning
20   incidents in which took place between me and inmate
21   Wayne Thomas and Robert Ashley that I should not have
22   contact with.
23   Q.  And why did you think Brian Engrem had to
24   provide these to supervisors?

18  (Pages 66 to 69)

Proctor v. Taylor, et al.
Ronald Proctor

Page 70

1    A. Because I submitted them to him for copies,
2    copy service. He works in the law library.
3    Q. I'm just trying to characterize your complaint
4    against Brian Engrem. Is your complaint that he
5    failed to copy affidavits that you submitted?
6    A. No, he took the copies of the affidavits that I
7    sent him and he did not send them back to me or
8    provide me with copies of them or the originals back.
9    Q. And how did that injure you?
10   A. It prevented me from notifying deputy warden
11   and the warden and filing grievances as to incidents
12   with Wayne Thomas.
13   Q. Does the grievance procedure require you to
14   have an affidavit?
15   A. No, affidavits were, can be submitted as
16   exhibits to grievance proceedings.
17   Q. Okay, so affidavits can be submitted but
18   they're not required; is that right?
19   A. Right.
20   Q. So since you did not get these affidavits from
21   Brian Engrem, did you submit your grievance without
22   the affidavit anyway?
23   A. Yes.
24   Q. And what is the date of that grievance?

Page 71

1    A. It says here on the bottom notation that can
2    be, the dates and filings can be established through
3    the grievance records.
4    Q. So you don't have a date for that grievance?
5    A. I don't have a copy of the grievances back.
6    They didn't provide them back.
7    Q. And the last defendant you've named is David
8    Pierce. I'd like you to tell me how he became aware
9    of the no-contact order or the allegations in your
10   complaint.
11   A. On 2-10-05 letter to Betty Burris on page, on
12   page 4, failure to document incidents against my
13   person at No. 4.
14   Q. So you believe that Warden Pierce should have
15   been aware of the allegations in your complaint or the
16   no-contact orders because of the letter you wrote to
17   Betty Burris; is that right?
18   A. No, also the letters that I wrote to him too
19   specifically about this.
20   Q. When did you write those letters?
21   A. It doesn't, it doesn't say inside here except
22   for the notation at the bottom. It says, "Dates and
23   filings can establish through" -- well, it would
24   probably be in my inmate file. "Attached here to show

Page 72

1    an ongoing pattern of denial to act. Dates and
2    filings can be established through discovery." In
3    other words, if you can't keep copies of what you're
4    filing, then you can't be required to know the
5    specific dates at this time without obtaining copies
6    of the inmate record, my inmate file, because anything
7    that you file with these people have to go into your
8    inmate file. And that's where they are.
9        In other words, we don't have, we don't
10   have access to copy service. And when I would write
11   up an incident, I would send it straight to them and
12   they would not even respond to it. And I would just
13   document it as being nonresponded to it at the end of
14   the grievance proceedings.
15       Like on Exhibit F in the grievance report,
16   it states Sunday 2-20-05, then 2-22-05, and then
17   2-13-05. You know, it just shows dates the incidents
18   occurred and that they were, grievances were filed and
19   never heard. You file a grievance and they don't hear
20   it, so you don't retain copies of the grievances that
21   you file because they're supposed to send them back to
22   you. And I never get copies of the grievances filed
23   so I have to write these little notations at the end
24   of the grievances in order to determine what was

Page 73

1    occurred as an ongoing pattern of incidents concerning
2    whoever doesn't respond to me.
3    Q. I'm asking specifically about Warden Pierce.
4    What reason do you have to believe that he had
5    personal knowledge of allegations in your complaint?
6    A. By direct notification and/or through grievance
7    filings since he's the head of the, this unit.
8    Q. But you can't tell me what that direct
9    notification was?
10   A. "Dates and time and periods exhibit have been
11   attached here to show an ongoing pattern of denial of
12   act -- to act. Dates and filings can be established
13   through" -- yeah, it would have to come through my
14   inmate, my inmate records, through my inmate file.
15   Q. I'd like to talk a little bit about your
16   history within the institution. Do you have a long
17   disciplinary record?
18   A. I can't answer that question unless I review my
19   inmate file.
20   Q. Do you recall being disciplined while
21   incarcerated?
22   A. I get write-ups.
23   Q. Do you recall the types of write-ups you
24   received?

19 (Pages 70 to 73)

Proctor v. Taylor, et al.
Ronald Proctor

Page 74

1    A.  No.
2    Q.  You don't recall any one?
3    A.  No.
4    Q.  Do you recall how many you've received?
5    A.  Numerous.
6    Q.  Are you talking dozens, hundreds?
7    A.  Without reviewing the record, I couldn't give
8    you that answer.
9    Q.  More than 10?
10   A.  Possibly.
11   Q.  Possibly or you don't know?
12   A.  I don't know.
13   Q.  What different security levels have you been
14   held at?
15   A.  I just came off of work release.
16   Q.  Other than work release, what other levels?
17   A.  All different levels.  Tomorrow I might be
18   minimum custody.  Today I'm max.
19   Q.  So you've been held in work release, you've
20   been held in maximum, you've been held in minimum --
21   have you been held in minimum before?
22   A.  Yes.
23   Q.  Any other levels?
24   A.  Medium.

Page 75

1    Q.  Any others?
2    A.  No.
3    Q.  If this case goes to trial, who do you plan on
4    calling as a witness?
5    A.  I can't answer that question unless I have my
6    original file, and I'm trying to obtain them now.
7    Q.  And if the case goes to trial, what documents
8    would you introduce into evidence?
9    A.  My inmate file.  My inmate file.
10   Q.  Anything else?
11   A.  No.
12   Q.  What was your most recent arrest for?
13   A.  Most recent arrest for.  June 11th, '06.
14   Q.  What was that for?
15   A.  Reckless endangerment.
16   Q.  Were there any other charges?
17   A.  Some predicate charges, terroristic
18   threatening, theft.
19   Q.  Anything else?
20   A.  No.
21   Q.  What other crimes have you been arrested for?
22   A.  Burglary third, reckless endangerment second,
23   conspiracy, receiving stolen property, robbery second,
24   failure to stop command of a police officer.  That's

Page 76

1    it.
2    Q.  Anything else that you can recall?
3    A.  No.
4    Q.  Do you believe there may be some that you can't
5    recall?
6    A.  Yes.
7    Q.  Do you recall what your longest period of
8    incarceration was?
9    A.  Yes.
10   Q.  And what was that?
11   A.  Six years.
12   Q.  And when was that?
13   A.  To date, from 1997 to date.
14   Q.  And you were recently out of prison for eight
15   days.  From '97 till today have you been out any other
16   time?
17   A.  No.
18   Q.  And what was the crime that you were
19   incarcerated for in '97?
20   A.  Reckless endangerment, burglary third.
21   Q.  Can you tell me the facts surrounding that
22   crime?
23   A.  It was an altercation concerning a bondsman
24   attempting to apprehend me for a failure to appear.

Page 77

1    Q.  And how did the burglary charge arise from
2    that?
3    A.  Burglary charge was, arised from that, or I was
4    charged with it but I pled guilty to receiving stolen
5    property.  That was the original charge that I was
6    placed on bail for.
7    Q.  The original charge was burglary?
8    A.  Yes.
9    Q.  And you pled down to receiving stolen property?
10   A.  Yes.
11   Q.  What were the facts surrounding the burglary?
12   A.  A vehicle that was purchased through my friends
13   that owned a junkyard, and I bought it from them and
14   come to find out that it was stolen.
15   Q.  So are you saying you didn't know it was
16   stolen?
17   A.  Not at that time, no.
18   Q.  So who said it was stolen?
19   A.  Police who arrested me.
20   Q.  The person you bought it from --
21   A.  Yes.
22   Q.  -- they didn't tell you it was stolen?
23   A.  Yes.
24   Q.  They did tell you?

20 (Pages 74 to 77)

Proctor v. Taylor, et al.
Ronald Proctor

| Page 78 | Page 80 |
|---|---|
| 1   **A. They didn't.** | 1   right? |
| 2   Q. And these were your friends? | 2   **A. Yes.** |
| 3   **A. Yes.** | 3   Q. Did anyone wake up while you were there? |
| 4   Q. Are they still your friends? | 4   **A. No.** |
| 5   **A. Well, they were arrested with me, so...** | 5   Q. Do you know how many people were there? |
| 6   Q. On the same charge? | 6   **A. The burglary was not contained within the same** |
| 7   **A. Yes.** | 7   **structure that the people were living in. It was a** |
| 8   Q. Where did they get the car from? | 8   **garage attachment.** |
| 9   **A. They purchased it from the person who stole it.** | 9   Q. I see. So was the garage attached to a house? |
| 10   Q. And those are the charges you were incarcerated | 10   **A. Yes.** |
| 11   for six years for? | 11   Q. And you entered the garage? |
| 12   **A. Yes.** | 12   **A. Right.** |
| 13   Q. Did you incur any other criminal charges during | 13   Q. And took the items from the garage? |
| 14   the course of that time period? | 14   **A. Yeah, but I never entered the residence where** |
| 15   **A. No.** | 15   **they slept.** |
| 16   Q. And prior to '97, what were the crimes that you | 16   Q. Now, other than the six years and the three |
| 17   were incarcerated for before then? | 17   years, do you remember what your next longest period |
| 18   **A. I can't remember without looking at something** | 18   of incarceration was? |
| 19   **specific. I just know in general terms.** | 19   **A. Three years.** |
| 20   Q. Do you recall, other than the six-year, what | 20   Q. And what was that crime? |
| 21   your longest period of incarceration was? | 21   **A. I just explained it to you.** |
| 22   **A. Three years.** | 22   Q. No, other than the six years and the three |
| 23   Q. And what was that crime? | 23   years. |
| 24   **A. Burglary second.** | 24   **A. Eighteen months in Florida.** |

| Page 79 | Page 81 |
|---|---|
| 1   Q. And what were the facts surrounding that | 1   Q. And what was the charge? |
| 2   burglary? | 2   **A. Failure to stop command of a police officer.** |
| 3   **A. That I broke into a house and stole some items** | 3   Q. Any other charges? |
| 4   **from the house.** | 4   **A. No.** |
| 5   Q. And was this during the night day or night? | 5   Q. And what were the facts surrounding that? |
| 6   **A. Night.** | 6   **A. I didn't stop for the cops when they asked you** |
| 7   Q. Was anyone in the home? | 7   **to stop. Kept on going.** |
| 8   **A. Yes.** | 8   Q. Was the police officer attempting to pull you |
| 9   Q. What did you take? | 9   over? |
| 10   **A. Numerous items, antiques.** | 10   **A. Um-hum.** |
| 11   Q. Anything else? | 11   Q. And you chose to keep driving? |
| 12   **A. No.** | 12   **A. Yes.** |
| 13   Q. What types of antiques? | 13   Q. And how long did you drive for? |
| 14   **A. Old baseball memorabilia, a grandfather clock,** | 14   **A. 130 miles.** |
| 15   **an old table.** | 15   Q. And were the police officers in pursuit the |
| 16   Q. Why is it that these are the items you chose to | 16   entire time? |
| 17   take? | 17   **A. Yes.** |
| 18   **A. They were valuable.** | 18   Q. And why didn't you stop? |
| 19   Q. Did you sell them? | 19   **A. I just didn't stop because I was wanted from** |
| 20   **A. Yes, I did.** | 20   **another state.** |
| 21   Q. And how did you get caught? | 21   Q. Where were you wanted? |
| 22   **A. The vehicle was traced back to me and said that** | 22   **A. Delaware.** |
| 23   **the vehicle was also involved in a burglary.** | 23   Q. After you served your time in Florida for that |
| 24   Q. So you used a car to get to the house; is that | 24   charge, were you transferred to Delaware? |

Proctor v. Taylor, et al.
Ronald Proctor

Page 82

1   A. Yes.
2   Q. And when you were driving for the 130 miles
3   from the police officer, were you speeding?
4   A. At 110 mile an hour.
5   Q. You were driving at 110 miles per hour; is that
6   right?
7   A. Had the cruise control on.
8   Q. What type of road were you driving on?
9   A. State highway.
10  Q. Were there other vehicles around?
11  A. Numerous.
12  Q. How did the police officers finally stop you?
13  A. Stop sticks.
14  Q. And moving back, we've covered the six years
15  and the 18 months in Florida and another three years
16  in Delaware. Do you remember your next longest period
17  of incarceration?
18  A. No.
19  Q. What were the charges in Maryland that you were
20  in pretrial for?
21  A. Possession of marijuana.
22  Q. Anything else?
23  A. Nope.
24  Q. Did you use marijuana?

Page 84

1   immunity Title 10, 1001 to 1020 in the amount of
2   10,000 each defendant, and 1.5 million from the State
3   of Delaware. Those are general terms.
4   Q. How did you come up with that amount?
5   A. Just placed it on there in numerical amounts
6   required by the form that you use to fill out to file
7   the complaint with. And the current case law, which
8   was Hamilton vs. Levy.
9   Q. You used Hamilton to arrive at that specific
10  amount?
11  A. Yes.
12  Q. Was there an amount in Hamilton?
13  A. Yes, Mr. Hamilton was two cells down from me
14  when I filed this complaint in 2005.
15  Q. Did he assist you in filing the complaint?
16  A. No.
17  Q. I guess I'm still not clear how you came up
18  with those amounts. You say you used Hamilton. Can
19  you just explain to me what you mean?
20  A. Well, I used, I used the amounts as a
21  determining factor as to what should be punitive,
22  compensatory damages both psychological in nature.
23  Q. Are you claiming psychological damages?
24  A. Yes.

Page 83

1   A. Nope.
2   Q. Why did you have it?
3   A. Selling it.
4   Q. Were you charged with any intent to deliver
5   charges?
6   A. No, just possession.
7   Q. How much did you have?
8   A. They only caught me with a small amount.
9   Q. How long have you been selling it?
10  A. About two years.
11  Q. And who did you sell it to?
12  A. Everybody.
13  Q. Was this in Maryland?
14  A. Yes.
15  Q. Did you ever sell it in any other states?
16  A. No.
17  Q. Did you ever sell anything other than
18  marijuana?
19  A. No.
20  Q. Now that you've looked at your complaint, I'd
21  like to ask you again, what are you seeking from this
22  lawsuit?
23  A. As it states in the last page, damages from
24  each defendant listed in the amount outside of state

Page 85

1   Q. What type of psychological problems have you
2   had because of this?
3   A. They're all — it's all contained within my
4   inmate file. Subpoena medical records and
5   psychological records.
6   Q. Well, I'm asking you, not what's in your file.
7   I'd just like to ask you what damages do you think
8   you've suffered?
9   A. Without reviewing the rest of the file, I can't
10  answer that question specifically.
11  Q. Are you alleging you suffered any injuries?
12  A. Yes.
13  Q. What types of injuries, physical injuries?
14  A. Everyday acts of spit, feces, urine, banging on
15  cells throughout the nights, mental anguish, all
16  document, and psychological services is the extent of
17  a copy of the incidents.
18  Q. Well, we've already talked about the
19  psychological injuries you're claiming. I'm asking
20  you what physical injuries you're alleging?
21  A. The physical injuries are also incurred
22  personal injuries as a result of documents submitted
23  to the medical personnel as contained within my inmate
24  file.

22 (Pages 82 to 85)

Proctor v. Taylor, et al.
Ronald Proctor

### Page 86

1    Q.  Do you recall specifically any physical
2  injuries that you suffered?
3    **A.  Without reviewing the complaint, I can't answer**
4  **that specifically.**
5    Q.  Okay, well you're looking at the complaint,
6  right?
7    **A.  Yes, but it says notation here, it says that**
8  **numerous incidents all documented, and down here it**
9  **has a notation, so in other words, without discovery**
10  **or a subpoena duces tecum, my inmate file, then I**
11  **can't answer that question specifically.**
12    Q.  Do you recall a specific mental health visit in
13  relation to the allegations in your complaint?
14    **A.  Not unless I review my inmate file.**
15    Q.  Do you recall any specific visits to physicians
16  with regard to allegations in your complaint?
17    **A.  There were probably numerous of them,**
18  **incidents.**
19    Q.  Do you recall any?
20    **A.  Without reviewing my inmate file, I can't**
21  **provide you with any specifics.**
22    MS. XARHOULAKOS:  I believe that's all I
23  have.  Just give me a minute to make sure I covered
24  everything.  Yes, that's it.

### Page 87

1    Mr. Proctor, you have an opportunity if
2  you'd like to add, if you want to add any testimony to
3  the record --
4    THE WITNESS:  No.
5    MS. XARHOULAKOS:  -- anything that I
6  didn't cover.  If not, then we'll be finished.
7    THE WITNESS:  No.
8    MS. XARHOULAKOS:  Okay.
9    (The deposition concluded at 12:03 p.m.)
10    I N D E X
11  Deponent:  RONALD PROCTOR            Page
12  By Ms. Xarhoulakos................................. 2
13    E X H I B I T S
14  Proctor:                Page
15    1    Amended Complaint          2
16    - - - - -
17
18
19
20
21
22
23
24

### Page 88

Replace this page
with the Errata Sheet
after it has been
completed and signed
by the Deponent

### Page 89

1    CERTIFICATE
2  STATE OF DELAWARE )
         )
3  NEW CASTLE COUNTY)
4    CERTIFICATE OF REPORTER
5    I, Julie H. Parrack, Registered Professional
   Reporter and Notary Public, do hereby certify that
6  there came before me on the 6th day of February, 2007,
   the deponent herein, RONALD PROCTOR, who was duly
7  sworn by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
8  deponent and the answers given were taken down by me
   in Stenotype notes and thereafter transcribed by use
9  of computer-aided transcription and computer printer
   under my direction.
10
    I further certify that the foregoing is a true
11  and correct transcript of the testimony given at said
   examination of said witness.
12
    I further certify that I am not counsel,
13  attorney, or relative of either party, or otherwise
   interested in the event of this suit.
14
15
    Julie H. Parrack, RMR, CRR
16    Certification No. 102-RPR
    (Expires January 31, 2008)
17
18
   DATED:_____
19
20
21
22
23
24